THE HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| THOMAS K. STARK,<br><br>  Plaintiff,<br><br>  v.<br><br>TOTEM OCEAN TRAILER EXPRESS, INC; INTEROCEAN AMERICAN SHIPPING CORPORATION; SEA STAR STEVEDORE CORP., amended to SEA STAR STEVEDORE CO., *in personam*, and SS NORTHERN LIGHTS, Official No. 561732, its machinery equipment and appurtenances, *in rem*,<br><br>  Defendants. | In Admiralty<br><br>NO.  C05-5808RBL<br><br>FINDINGS OF FACTS AND CONCLUSIONS OF LAW |

This non-jury action having come on for trial and the Court having heard and reviewed the testimony of the witnesses, the evidence of records, and the contentions and arguments of counsel, the Court, in accordance with Rule 52(a) of the Federal Rules of Civil Procedure, makes its findings of fact and conclusions of law as follows.  To the extent that the following findings of fact should more properly be considered conclusions of law, and vice versa, they are hereby adopted as such.

FINDINGS OF FACT
CONCLUSIONS OF LAW- 1

**FINDINGS OF FACT**

1. This action was originally brought by plaintiff Thomas Stark against defendants Totem Ocean Trailer Express, Inc. (TOTE), Interocean American Shipping Corp. (IAS)(formerly Interocean Ugland Management Corp.) and Sea Star Stevedore Co. (Sea Star). In the amended complaint, Stark alleged causes of action against TOTE and IAS under the Jones Act, 46 U.S.C. §30104, and for unseaworthiness. Against Sea Star, Stark alleged a general claim for negligence.

2. Shortly before trial, TOTE settled with plaintiff Stark and obtained a release of all of the defendants including Sea Star. TOTE paid Stark $1,795,000 in addition to maintenance and cure payments it had earlier made to him. TOTE now seeks indemnity or contribution from Sea Star for the amounts it has paid to Stark. Sea Star seeks indemnification from TOTE of its legal fees and costs incurred in defending this action.

3. TOTE is a Washington corporation with its principal place of business in Tacoma, Washington. TOTE is a wholly owned subsidiary of SaltChuk Resources, Inc. TOTE owns several roll on – roll off (Ro-Ro) vessels, including the S.S. NORTHERN LIGHTS. TOTE operates as a common carrier of cargo between Tacoma, Washington and Anchorage, Alaska.

4. IAS is a Delaware corporation with its principal place of business in New Jersey. TOTE has an Agency Agreement with IAS whereby IAS acts as TOTE's agent in the management and operation of the TOTE vessels including the S.S. NORTHERN LIGHTS. Pursuant to the Agency Agreement, IAS hires, on behalf of TOTE, the crew of the TOTE vessels including the master and licensed officers.

FINDINGS OF FACT
CONCLUSIONS OF LAW- 2

5. Sea Star is a Washington corporation with its principal place of business in Tacoma, Washington. Sea Star has done the stevedoring and terminal work for TOTE since TOTE's inception approximately 30 years ago. TOTE and Sea Star entered into a Stevedoring and Mechanics Services Agreement on November 1, 1996. Although that contract's term ended on June 30, 2000, the parties continued to operate under the terms and conditions of that contract while they negotiated a new agreement. This contract was in effect during the relevant times of this litigation.

6. Stark is 50 years old. He graduated in 1981 from Texas A&M with a degree in Marine Transportation. He worked in the marine industry as a licensed officer on merchant vessels since graduating from college. He started working for IAS (formerly Interocean Ugland Management) on the vessels owned by TOTE in 1990. He was a member of the American Maritime Officers Union (AMO). He worked his way up from 3rd Mate to Chief Mate on the TOTE vessels. In the summer of 2002, Stark served as relief master on the M/V NORTHERN LIGHTS.

7. At approximately 2115 hours on Friday, December 27, 2002, Stark's right leg was pinched between the rear wheels of a trailer exiting down the aft ramp and the ramp support arm. At the time of the injury, Stark was standing in the winch control area nearby the aft ramp, a routine work assignment location for the ship's crew. While he was talking on the ship's telephone, Stark had his right foot outside the protected area. Stark didn't see the hostler or trailer pass by him before his right leg was pinned by the rear tires of the trailer. Stark's right leg was broken in two places below the knee.

8. The TOTE ships are all Ro-Ro vessels. The cargo is transported in trailers which are driven on and off the ships by hostlers using ramps within the vessel and to the

dock. The trailers are stowed on the vessel with the use of Roloc boxes and lashed to securing points on the deck. When the vessel arrives at Tacoma, the southbound trailers are driven off. Because of TOTE's tight vessel schedule, as soon as there is enough room on the vessel, Sea Star starts bringing loaded northbound trailers onto the vessel.

9. During the winter months, TOTE has two vessels sailing between Tacoma and Anchorage. One vessel arrives in Tacoma on Wednesday afternoon and departs early Thursday morning. The other vessel arrives on Friday afternoon, and departs early Saturday morning. It is extremely important to TOTE that the vessels depart on time in order to make the scheduled arrivals in Anchorage.

10. TOTE recently had two new Ro-Ro vessels constructed and put into service. The injury to Stark occurred on one of the older vessels, the M/V NORTHERN LIGHTS. The older vessels are much smaller with much less room for the hostlers and trailers to maneuver. The older vessels have three ramps on the starboard side of the vessel which are used for loading and unloading cargo in Tacoma.

11. Although TOTE owns the vessels, it uses IAS to provide the ship's crews. Stark was an employee of IAS. The agency agreement between TOTE and IAS provides that IAS acts as TOTE's agent in employing the vessel crew. Stark had worked on the TOTE ships for a number of years. He had risen to chief mate on the M/V NORTHERN LIGHTS and thus was very familiar with the vessel layout, TOTE's routine and the cargo operations.

12. On the TOTE vessels, one of the principal responsibilities of the chief mate is to oversee the cargo operations in both Tacoma and Anchorage. He is intricately involved in the loading/unloading operations. He monitors the ramps to make sure the ramps are in proper position during the cargo operations (the vessel's list, cargo load and tide affect how

the ramps are adjusted); he monitors the ship's lines to make sure the vessel stays in proper position during the loading operations; he has to verify that hazardous cargoes are properly located on the vessel; and he inspects to make sure the trailers are properly secured to the deck prior to the vessel sailing. During the unloading/loading process, if the ship takes on a list, the chief mate coordinates with the engine room to trim the vessel. As a result of his duties, the chief mate has to be working throughout the cargo operations. He is often on the cargo decks during the loading and unloading of the trailers so is intimately familiar with the movements of hostlers and trailers throughout the vessel and to/from the dock.

13. The M/V NORTHERN LIGHTS arrived in Tacoma on the afternoon of Friday, December 27, 2002, and moored starboard side to. Ron Bredeson was one of the longshoremen working for Sea Star that evening. He was driving one of the hostlers hauling containers on or off the vessel. Ron Bredeson is a very experienced driver. He is certified by PMA as a TOTE driver and hostler instructor and had no prior driving incidents. His shift started at 6:00 p.m. At approximately 9:15 p.m., Bredeson brought a loaded trailer onto the vessel and positioned it on the aft part of the second deck on the port side of the ship. He then drove over and hooked up to a forty(40) foot empty container in position #273 on the outboard starboard side of the ship. The container was located just forward of the aft ramp, on the same side of the ship as the ramp. Trial Ex. 39, 40.

14. After hooking up to the Roloc box attached to the trailer, Bredeson had to first make a sharp turn inboard and then make a sweeping turn inside the ship to get headed toward the aft ramp. He had to maneuver the trailer to avoid several stanchions. At the same time, he had to check to see if any hostlers were coming up the aft ramp or if any hostlers and trailers were exiting down from the upper deck on the interior ramp located in this area.

Because of the small turning area, the hostler has to approach the ramp from the aft side as the rear trailer wheels are slid around and come along the forward side of the ramp.

15. The winch controls for the aft ramp are located at the forward side of the ramp. Trial Ex. 2, 3, 4. In addition, one of the ship's telephones is located in this area. The area is crammed with equipment and has lines going out to the cables attached to the ramp. There is limited room to stand by the telephone. Crewmembers routinely stand in this area to operate the winch controls and there is a protected area where the crewmembers can stand. The stanchion mounted inboard from the winch controls provides the protection for this area. The rear wheels of the trailers going on and off the vessel will sometimes rub against this stanchion and against the ramp arm because of the sharp turns necessary to position the trailers on the vessel.

16. At the time Bredeson was hooking up to the trailer and maneuvering to take the trailer out of position #273, Stark had gone over to the winch controls located on the forward side of the aft ramp. Stark had just relieved the third mate who had to get rest before standing the first navigation watch when the vessel departed Tacoma early Saturday morning. The AB on watch could not get the winch controls to operate properly, so Stark went to adjust the aft ramp. Stark then operated the winch controls.

17. While he was going to the aft winch control station, someone in TOTE's terminal office had radioed Stark requesting that the list on the vessel be adjusted. After adjusting the aft ramp using the winch controls, Stark used the ship's telephone located in this area to call the engine room to have the engineers adjust the ship's list.

FINDINGS OF FACT
CONCLUSIONS OF LAW- 6

18. Although Stark thought he was completely inside the protected area by the winch control box, in fact, his right foot was outside the protected area resting outside the box for the aft ramp arm.

19. Mr. Stark testified there was sufficient room in the area defined by those two structures for him to stand, and a photo of the area admitted as an exhibit shows a person standing easily within the area. No one had ever been injured by passing traffic while standing inside the protected area, and Mr. Stark considered it a safe location.

20. Mr. Stark admits he knew it would be dangerous for any part of his body to be outside the protected area, due to the passing trailers, and that there was absolutely no need for him to have any part of his body outside that protection. He testified that he believes he was within the protected area, at the time his leg was struck by the trailer tire. However, he also testified he cannot explain how his leg could have been struck by the trailer if his leg had, in fact, been within the protected area.

21. Accident reconstruction experts presented by both TOTE/IAS and by Sea Star testified and presented graphic evidence to the effect that it would have been physically impossible for Stark's leg to have been injured if it had been within the protection provided by the stanchion and the ramp arm. The Court finds this evidence persuasive and finds that, despite Stark's testimony, his right leg was outside the protected area at the time of the accident.

22. While Stark was in the area of the winch control box, Bredeson maneuvered the trailer out and started toward the aft ramp. Bredeson was watching to make sure the hostler cleared the aft sideshell as he got to the ramp. As the hostler and trailer started down the aft ramp, Bredeson looked in his driver's side rearview mirror to make sure the rear

wheels were going to make it onto the ramp. At that time, he saw Stark in the mirror and saw that Stark's leg had been pinned against the ramp support arm by the trailer's rear wheels. Bredeson never expected anyone to have their leg in this area as the rear wheels of the trailers will often rub up against the stanchion and ramp support arm as the trailers are being driven on or taken off the ship. After seeing Stark in his mirror, Bredeson immediately stopped his hostler and backed up slightly so Stark could free his leg. Bredeson got out of the hostler to see if Stark was okay. Stark informed him that he was injured and Bredeson immediately radioed the Longshore tower for an aid car. Stark also used his own radio to call for assistance.

23. As a result of the accident, Stark's leg was crushed with bones protruding through the skin. Stark lost considerable blood, but did not lose consciousness.

24. Sea Star's superintendents interviewed Bredeson and told him to take the hostler and trailer off the ramp so that the aid car could come on the vessel. Stark was transported by the aid car to St. Joseph's Hospital in Tacoma. Stark underwent surgery to repair the broken lower right leg. A rod was inserted into the leg. The next day Stark had a skin graft done to close the wound area. Stark was discharged from St. Joseph's on January 5, 2003, and flew home to Sarasota, Florida. In March 2003, Stark underwent a bone graft to promote the healing of the leg bone.

25. On December 19, 2005, Stark filed this lawsuit shortly before the three year maritime statute of limitation was to expire. Stark sued TOTE, IAS and Sea Star. In the complaint, Stark alleged claims against TOTE and IAS under the Jones Act, 46 U.S.C. §30104 and unseaworthiness based on the general maritime law. Sea Star was sued for alleged negligence of Ron Bredeson.

26. TOTE paid maintenance and cure obligations including all of the medical expenses associated with Stark's injury. In addition, TOTE paid Stark full wages for approximately 18 months after his injury.

27. Sea Star incurred legal fees and expenses in defending the action brought by Stark and the cross claim of TOTE for indemnity and contribution.

28. The Stevedoring and Mechanic Services Agreement between TOTE and Sea Star contains the following indemnity provision:

> 4.4  Damages
>
> 4.401 Sea Star <u>will</u> be responsible for any injury or death of any person <u>caused primarily by the negligence of Sea Star</u>, its agents, servants or employees, and shall indemnify TOTEM against any and all losses, damage, cost and expense, including attorneys' fees, that may be suffered by TOTEM resulting from breach of such responsibility. . . .
>
> 4.402 TOTEM <u>shall</u> be responsible for any injury or death of any person or for damage to or loss of property <u>primarily arising through the negligence of TOTEM, its agents, servants or employees</u>, <u>or by reason of failure of ship's gear and equipment</u>; and TOTEM shall indemnify Sea Star against any and all losses, damage, cost and expense, including attorneys' fees, that may be suffered by Sea Star resulting from breach of such responsibility.

(Emphasis added).

29. Although a stevedore contract would be considered a maritime contract, the Stevedoring and Mechanic Services Agreement specifically provides that it is governed by Washington law. The contract states:

> 4.10  <u>Law</u>
>
> This Agreement shall for all purposes be governed by and construed in accordance with the laws of the State of Washington.

FINDINGS OF FACT
CONCLUSIONS OF LAW- 9

Trial Ex. 49.

30. The Agency Agreement between TOTE and IAS makes it clear that IAS was TOTE's agent for all aspects of the management of the TOTE vessels. The Agency Agreement states:

> I. <u>The Agency</u>
>
> Upon commencement of the Agreement, the Agent [IAS] shall, on behalf of TOTE, attend to the business regarding the management and operation of the vessel as hereinafter provided, and all of Agent's acts hereunder in connection with the Vessel shall be done as an agent for and on behalf of TOTE.

Trial Ex. 48. With respect to manning the TOTE vessels, the Agency Agreement specifically states:

> III. <u>Agent's Duties</u>
>
> \*\*\*
>
> B. Make all appropriate arrangement, supervise or provide the supervision for the manning of the Vessel, <u>including the engagement and dismissal on behalf of TOTE of the Master, officers and crew</u>; . . .

Trial Ex. 48 (Emphasis added). Any negligence on the part of IAS would be imputed to TOTE under the Agency Agreement. Although technically an employee of IAS, any negligence on the part of Stark would also be imputed to TOTE.

31. Defendant Sea Star incurred legal fees and costs in defending this action. Prior to the commencement of trial, Sea Star had incurred a total of $222,960.12 in legal fees and costs.

## CONCLUSIONS OF LAW

1. Jurisdiction is vested in this court by virtue of the general maritime law, 46 U.S.C. §688, and 28 U.S.C. §1333(1).

FINDINGS OF FACT
CONCLUSIONS OF LAW- 10

    2.       The Stevedore and Mechanic Services Agreement is a maritime contract. However, in the contract, the parties specified that the Agreement would be construed in accordance with Washington law.  Under Washington law, indemnification agreements such as that contained in the Stevedoring and Mechanic Services Agreement are valid and enforceable.  See, McDowell v. The Austin Co., 105 Wn.2d 48, 710 P.2d 192 (Wash. 1985).

    3.       Under the Stevedore and Mechanic Services Agreement, Sea Star would have to indemnify TOTE if the injuries to Stark were caused primarily by the negligence of Sea Star, its agents, servants or employees.  On the other hand, TOTE is responsible for any injury of any person primarily arising through the negligence of TOTE, is agents, servants or employees, or by reason of failure of the ship's gear and equipment.

    4.       It is clear from the evidence presented at trial that the injuries to Stark arose primarily through his own negligence.

    5.       At the time the hostler and trailer were exiting down the aft ramp, Stark's right leg was outside the protected area.  Although Stark thought he was standing inside the protected area and could not be struck by a hostler or trailer, he was not paying attention and in fact had his right leg outside the protected area.

    6.       Pursuant to the Stevedore and Mechanic Services Agreement, TOTE is responsible for injury or death of any person primarily arising through the negligence of TOTE, its agents, servants or employees, or by reason of failure of ship's gear and equipment.  Stark qualifies as an agent and as an employee under the indemnity agreement.  TOTE must indemnify Sea Star against "any and all loss, damage, cost and expense, including attorney's fees, that may be suffered by Sea Star resulting from breach of such responsibility.  Sea Star is entitled to recover all of the costs and

FINDINGS OF FACT
CONCLUSIONS OF LAW- 11

expenses, including legal fees that it incurred in investigating and defending Stark's claims.

      7.    Sea Star has submitted a summary of its costs and expenses including legal fees incurred prior to this trial. Sea Star is entitled to indemnity from TOTE for all of its legal fees and costs including those legal fees incurred at trial.

      8.    Sea Star shall submit documentation of its total legal fees and costs by March 15, 2007. TOTE shall file any objection to Sea Star's legal fees and costs by March 29, 2007.

      9.    TOTE's claims for indemnity is denied.

      10.    Sea Star's claim for indemnity of its legal fees and costs based on the Stevedoring and Mechanic Services Agreement is granted.

      11.    Upon submission of its full legal fees and costs, the Court will direct the clerk to enter judgment in Sea Star's favor against TOTE.

DATED this 1st day of March, 2007.

*(signature)*
RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE